**STATE of Missouri,
Plaintiff-Respondent,**

v.

**John Thomas FERGUSON,
Defendant-Appellant.**

**No. KCD 30255.**

Missouri Court of Appeals,
Western District.

April 30, 1979.

R. J. O'Hanlon, Lee, O'Hanlon & Brady, St. Louis, for defendant-appellant.

John D. Ashcroft, Atty. Gen., Philip M. Koppe, Asst. Atty. Gen., Jefferson City, Earl W. Brown, III, Special Asst. Atty. Gen., Kansas City, for plaintiff-respondent.

Before DIXON, P. J., and TURNAGE and KENNEDY, JJ.

DIXON, Judge.

Defendant appeals his conviction of second degree murder. Defendant was tried under the provisions of the Second Offender Act, § 556.280 RSMo 1969, and, upon a jury finding of guilt, the trial judge imposed a sentence of thirty years.

A single issue is presented. The defendant asserts that the trial court erred in refusing defendant's instruction on self-defense predicated upon a theory of "appearances."

Defendant struck and killed the deceased with an iron pipe in the course of an altercation on the business premises where the defendant was employed. The deceased, in company with two of his daughters and three other persons, had been engaged in a daylong drinking bout. The party went to several taverns and ended up at a tavern across the road from the automobile agency where defendant was employed. One of the daughters of the deceased had purchased a motor vehicle there and had been having difficulty with it. The deceased walked across the road and spoke to the manager about when repairs would be undertaken. The manager answered, but the deceased apparently did not hear the response. Defendant then spoke to the deceased, and the deceased told the defendant to "shut up because he wasn't talking to him." While this exchange occurred, the deceased's vehicle was driven to the rear of the office by someone in the company of deceased. Besides the five persons in the deceased's party, there were several other witnesses to the events. Because of the nature of the defendant's claim of error, it will be necessary to set forth in some detail the accounts of the various witnesses, both substantively and sequentially.

Stating the chronology of events and their relationship to the place where the altercation occurred is difficult because the witnesses referred to an exhibit in placing the various events and the participants, and the exhibit has not been filed in this court. As best as may be gleaned from the descriptions of the witnesses, the business premises where the defendant was employed consisted of a front room, or showroom, which contained a small partitioned office; the balance of the front was open space with an opening to the showroom. A partition or semi-partition separated the showroom from the rear of the building which was utilized as a shop.

The witnesses, including the defendant, are all in agreement that the verbal altercation between the deceased and the defendant commenced at or near the office space in the front or showroom portion of the building. By one means or another, the two participants maneuvered to a position near the partition between the shop area and the showroom area where there was an opening in the wall or doorway, apparently of substantial size. As noted, the deceased was accompanied by his two daughters, Viola and Terry, as well as one Bob White, his wife, Candy White, and a person named Gary Pierce.

The testimony concerning the movements of the five persons in the company of the deceased is confusing, but it appears that when the deceased first entered the premises he was accompanied by his daughter, Terry, and Bob White. The other three in the party remained in the car. Terry, the deceased's daughter, apparently left before the verbal altercation and told her sister to move the car to the rear of the building, the car having been parked in a no parking zone. When she returned, the defendant had obtained the pipe, and she saw him strike her father. She then ran to get a ball bat from the car, but her sister had already obtained the ball bat and was entering the premises. She took the keys to the car from her sister, and Bob White went to the vehicle to get a rifle which was in the trunk of the car. All of this occurred after the deceased was struck. Gary Pierce says he went in the building after the defendant had the pipe and saw the fatal blow struck, but did not see the rifle. Viola corroborated Terry's testimony that she stayed outside, although she said four persons initially went into the building. Viola said Terry came out and told her that the defendant had struck her father.

When Viola entered the premises with the ball bat, Ferguson was almost to the front door carrying the pipe. Her claim is that Bob White came in with a gun after the defendant was struck and while she was striking at the defendant with the ball bat she was carrying. Bob White, on the other hand, contended that he had gone outside to look at a car and did not enter the premises until after the deceased was struck and was on the floor. He admits that he went to get the gun and says that he did not take the gun inside and did not load it. He denied making any threats against the defendant or taking the gun into the building. Candy White, his wife, entered the building while the defendant was striking the deceased, and after the deceased had fallen to the floor, she went to call an ambulance. She claims she did not see any rifle at the scene.

There were three witnesses who were not connected with the group accompanying the deceased. A man named George Pace, who was a customer at the automobile agency, saw the defendant and deceased arguing, and he saw the deceased after the blows had been struck with the pipe; but he did not see the actual striking by the defendant. He claimed that he did not see a man with a rifle either in the shop or aiming a rifle into the shop.

Harold Davis was another employee at the business; his testimony is that he was in the back part of the shop working on an automobile, and that the defendant retired from the showroom portion of the building, part of which Davis could see because of the wide opening in the partition. Davis said there was a group of people with the deceased and that he offered to help the defendant, it being obvious to him that an altercation was in progress. He said the defendant told him to stay out of it, and he did; but he observed the defendant pick up a "cheater" pipe or a length of pipe one inch in diameter and 16 to 18 inches long. At that point, according to the witness Davis, the people with the deceased had stopped in the opening separating the shop from the front. At that point, Ferguson invited the deceased to go out into the alley; there was some name calling and the defendant prodded the deceased in the stomach with the pipe. The deceased was holding his stomach at that point. The defendant and the deceased then moved out of this witness' sight momentarily and then came back into view through the wide opening in the partition, and it appeared to the witness that the deceased and the man with him were going out the front door. As they started toward the front door, the deceased turned around and called the defendant some kind of a "punk." At that time, the defendant swung the pipe and the deceased warded it off with his arm. After this blow was struck, the deceased was holding his arm; the defendant struck a second blow on the left side of the deceased's head, and the deceased collapsed on the floor.

After that occurred, the witness Davis said there was a lot of noise at the back door; a young woman ran in with a ball

bat, and there was another lady at the back door with a man arguing about the car keys. The woman outside the building threw the keys at the man, and the man went to the back of the car, opened the trunk, and came around the car into Davis' view carrying a rifle. The witness Davis then went out and talked the man with the rifle into putting it back in the trunk. Davis said that the man with the rifle had pointed it in the shop, but it is not clear from his testimony as to whether any part of the rifle entered the building or whether it was pointed through an open door. In any event, White was not in the shop with the rifle and at no time prior to the time the defendant struck the deceased was the rifle in sight, nor was the ball bat. All of those events occurred after the defendant had struck the deceased. Another young man named Pinion, who was employed at the agency, testified to virtually the same events but stated that the time of the incident with the rifle and bat and the striking of the defendant by the deceased was almost simultaneous.

The defendant's version of the events pretty well follows that of the other witnesses, the defendant saying that he heard a statement about getting a gun and hearing a man keep making the statement, "I'm going to get him." "I'm going to get him." But his testimony was that the ball bat incident occurred after he had struck the deceased the fatal blow and after he heard the deceased say, "Go get the gun." The defendant denies ever seeing the gun.

There is no question from all the evidence that the deceased was a large man, that he had been drinking heavily prior to the events which occurred. There was ample evidence that the deceased had a reputation for violent behavior. Premised upon this factual background, the defendant asserts that the court erred in refusing the defendant's instruction No. B. The court gave an instruction which was MAI–CR 2.40; this latter paragraph is the paragraph in the MAI instruction relating the doctrine of appearances to the doctrine of self-defense. The defendant concedes that the doctrine of appearances as delineated in State v. Cook-

sey, 499 S.W.2d 485, 489 (Mo.1973); State v. Minnis, 486 S.W.2d 280, 283–84 (Mo.1972); State v. Demaree, 362 S.W.2d 500, 503 (Mo. banc 1962), requires the defendant to have been subject to appearances, either verbal or visual, which subsequently are demonstrated to be false. In his argument, the defendant emphasizes State v. Lowe, 260 S.W.2d 729 (Mo.1953), which the defendant claims holds that an attack by some other person or persons is a special circumstance warranting the submission of an instruction on appearances. Before undertaking to discuss these authorities in connection with a claim of error posed by the defendant and the argument supporting it, an examination of the ground of error as it was alleged in the motion for a new trial demonstrates that the defendant raised the issue by asserting under five separate lettered paragraphs (a) the action of the deceased in advancing upon the defendant; (b) the defendant's awareness of the deceased's reputation for violence; (c) the defendant's fear of immediate death or bodily injury; (d) the threats made by the deceased to the defendant; (e) and the size of the deceased.

In the brief, defendant improperly expands the grounds raised in the motion for new trial by arguing that the threats of violence by others and the presence of the rifle and the ball bat were also appearances to be considered in the determination of defendant's claim of error. It is not necessary to rest the decision on that procedural defect.

Giving the defendant the benefit of the doubt on the procedural issue, the merits of the contention will be addressed. Based upon the foregoing statement of the evidence, it is obvious that the conflict in the evidence relates to the *time* of the occurrences, not to the *fact* of the occurrences. Depending upon which of the witnesses were *believed* by the jury, the defendant was either facing the deceased alone or facing a group armed with a ball bat and a rifle. The "appearances" may have been different depending upon which version of the events is considered as fact, but no witness testified to any fact which was

later demonstrated to have created a *false* appearance. The evidence concerning the loading of the rifle is, at best, equivocal and, at worst, conflicting, but the defendant does not raise an issue either in the motion for new trial or in the brief relating to the rifle being loaded or unloaded.

■ The appearance doctrine, as it is enunciated in the cited cases, is a special rule designed to afford a right of self-defense to the defendant based upon which "appears" to the defendant to a situation which justifies the use of force in self-defense. While it may be true in some factual situations that these "appearances" need not be supplied by the defendant's testimony, the doctrine does not extend to require the instruction on appearances when there is nothing to indicate that the apparent situation was misleading to the defendant.

■ Looking to the factual situation in the instant case, whichever set of facts is believed with respect to the time when the events involving the deceased's companions occurred, there was no false impression from the situation. There is no claim that the danger of harm to the defendant did not in fact exist. Viola testified she did attack him with the ball bat, albeit after the deceased had fallen. Bob White admits obtaining the rifle. The defendant's difficulty is that the jury apparently believed the testimony that the deceased was in retreat under the prodding of the defendant and that the final and deadly blow was not a necessary exertion of force.

The defendant's reliance upon *State v. Lowe, supra,* is misplaced. In *Lowe,* the *defendant* testified that shots were fired at him from inside a building prior to the assault upon the deceased, and according to the *defendant's* testimony, he was confronted with a simultaneous attack by several persons *before* he shot the deceased. This claim was apparently a fact which was controverted. In the instant case, the defendant's direct testimony is that the attack by Viola with the ball bat occurred after he struck the deceased. The cross-examination of defendant reveals that he never saw the gun prior to the fatal attack. Giving the defendant the full benefit of his own testimony, no fact or circumstance was in fact false or misleading. *Lowe* does not control because there is no claim defendant was misled or deceived by facts which gave the appearance of a danger which did not exist. There is simply nothing in this record to require the submission of paragraph 5 of MAI–CR 2.40, and the trial court did not err in refusing defendant's instruction B. The judgment and conviction are affirmed.

All concur.